[Cite as *Criss v. Young Star Academy, L.L.C.*, 2021-Ohio-3009.]

COURT OF APPEALS
ASHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| LORI CRISS, DIRECTOR, | : | Hon. W. Scott Gwin, P.J. |
| OHIO DEPARTMENT OF MENTAL | : | Hon. William B. Hoffman, J. |
| HEALTH AND ADDICTION | : | Hon. Earle E. Wise, J. |
| SERVICES | : | |
|  | : | |
| Plaintiff-Appellant | : | Case No. 21-COA-005 |
|  | : | |
| -vs- | : | |
|  | : | OPINION |
| YOUNG STAR ACADEMY, LLC | | |
|  | | |
| Defendant-Appellee | | |

CHARACTER OF PROCEEDING:      Civil appeal from the Ashland County Court of Common Pleas, Case No. 21-CIV-018

JUDGMENT:      Affirmed

DATE OF JUDGMENT ENTRY:      August 30, 2021

APPEARANCES:

For Plaintiff-Appellant
DAVID YOST
Ohio Attorney General
BY: TRISTA M. TURLEY
MORGAN TENDAM
Assistant Attorney General
30 East Broad Street
Columbus, OH 43215

For Defendant-Appellee
MARION A LITTLE
Ziegler, Tigges, & Little
41 South High Street
Columbus, OH 43215
JOEL H. MIRMAN
5 E. Long Street, Ste. 200
Columbus, OH 43215
HOLLY WILSON
KATIE L. ZORC
101 W. Prospect Ave., Ste. 1400
Cleveland, OH 44115

*Gwin, P.J.*

{¶1} Defendant- appellant Lori Criss, Director Ohio Department of Mental Health and Addiction Services ["the Department"] appeals from the Ashland County Court of Common Pleas granting of Appellee Young Star Academy, LLC's ["Young Star"] motion for direct verdict after a bench trial.

*Facts and Procedural History*

{¶2} Young Star Academy, LLC, doing business as Mohican Young Star Academy operates a licensed residential treatment facility for at risk youth. It is a regulated under R.C. 5119 and Ohio Administrative Code 5122. These statutory and regulatory requirements are administered by the Ohio Department of Mental Health and Administrative Services.

{¶3} Young Star is licensed by the Department to provide behavioral health services in a residential setting to young men aged 12 to 21. Its population is made up of referrals from Ohio courts and agencies. Some of the youth referred to Young Star have mental health and substance abuse issues. Young Star is licensed by Director Criss as a Class I residential facility for children. Class I child residential facilities serve unrelated children or adolescents with severe emotional disturbances. R.C. 5119.34(B)(1)(a). As a Class I facility, Young Star provides residents with housing accommodations, supervision, personal care, and mental health care services. R.C. 5119.34(B)(1)(a). At all times relevant to this case, Young Star served approximately 84 adolescent boys with severe emotional disturbances. The boys came from roughly 35 different counties throughout Ohio. As Young Star's licensing authority, the Department

can inspect or survey Young Star as necessary to ensure compliance with licensure requirements. Ohio Adm.Code 5122-30-05(A)(7).

{¶4} In 2018, while considering Young Star's initial application for licensure and certification as residential mental health facility, the Department cited Young Star for: (1) failing to identify methods from least restrictive to most restrictive for deescalating aggressive behavior by a resident; (2) using restraint debriefing forms that treated restraints as a "consequence" for certain behavior as opposed to a last resort to be used only in faces of imminent physical harm; (3) failure to establish reporting processes to adequately document incidents of physical restraint; and (4) using staff training materials that referred to the use of restraints for general "behavioral reasons" as opposed to a last resort to be used only in the face imminent physical harm.

{¶5} Ultimately, Young Star, with assistance from the Department, produced a plan of correction that adequately addressed the Department's concerns, and Young Star received a license.

{¶6} In early 2021, the Department received a complaint from a former employee of Young Star. It is the Department's regular practice to take complaints seriously and formally investigate them, without making any assumptions about their veracity. The investigations are conducted by Behavioral Standards Surveyors ("surveyors"). Surveyors are Department employees who inspect Department licensed facilities for compliance with applicable Ohio Administrative Code requirements.

{¶7} If the Department receives a complaint about the physical condition of a facility or the treatment of residents at the facility, the Department conducts an "onsite" investigation. Onsite investigations are often unannounced. During onsite investigations,

surveyors conduct a physical inspection of the facility and review patient records, staff files, medication records, and the facility's policies and procedures.  If the facility is one that employs restraints, the surveyors also review the restraint log.  Department-licensed facilities that conduct restraints are required by law to maintain such a log, which must record every incident of mechanical or physical restraint at the facility and include the name of the restrained resident, the date of the restraint, the restraint method used, and the duration of the restraint. Ohio Adm.Code 5122-26-16(I).

{¶8}     In response to the former employee's complaint, the Department conducted an onsite investigation of Young Star on January 28, 2021.  Three Department surveyors- James Budimlic, Apryl Morris, and Sarah Malik participated in the survey.  After the surveyors determined that certain issues required further investigation, Budimlic and Malik returned to Young Star on February 2 and 3, 2021, along with their supervisor, Donna Sabo. Morris continued her participation in the survey remotely, reviewing documents while off-site.

{¶9}     During the site visit on February 3, 2021, Budimlic requested video surveillance footage of several restraint incidents documented in Young Star's restraint log.   Some of the incidents for which he requested video were specifically mentioned by youth residents interviewed by Malik during the investigation. These included the restraints of NR, NS, NG, and ZR.  Budimlic also considered the duration of the restraints and whether the incidents happened in an area of the facility covered by surveillance cameras.

{¶10} On March 3, 2021, the Department, filed a Verified Complaint for Appointment of Receiver in the Ashland County Court of Common Pleas. The Department

brought the action pursuant to R.C. 5119.342 and Civ.R. 65, and moved the trial court to immediately appoint a receiver to take possession of and operate Young Star. The Department filed the Complaint, along with a Motion for Temporary Restraining Order and Preliminary Injunction Immediately Appointing Receiver, alleging that the existing conditions at the facility presented a substantial risk of physical and/or mental harm to the facility's residents, and no other remedies at law adequately protect the health, safety, and welfare of Young Star Academy's child residents. A magistrate granted the Department's ex parte motion the same day. The next day, March 4, 2021, the trial court *sua sponte* vacated the magistrate's order and scheduled the Department's request for a hearing on March 9, 2021, within the five-day time frame statutorily required under R.C. 5119.342.

{¶11} Thereafter, the Department filed a second Motion for Temporary Restraining Order and Request for Attorney Conference. The Department requested an order that would direct the "Ashland County Sheriff ("Sheriff') to immediately take possession of and secure all documents and records on the site of Mohican Young Star Academy ..., and to take whatever action the Sheriff deems necessary to protect such documents or records from destruction; and (2) authorize either Wingspan [Care Group] or Young Star to keep an on-site monitor at the Young Star facility at all times to ensure the health and safety of child residents at the facility." The trial court granted the Department's request for a status conference which was conducted on March 5, 2021.

{¶12} On March 8, 2021, the trial court issued a judgment entry denying the Department's request for injunctive relief, noting, first, "the assertions in the memorandum accompanying [the Department's] new motion are mostly the product of inference and

innuendo." [*Judgment Entry*, at 1.]   Young Star submitted an affidavit confirming the same. [Id.] The court noted that a temporary order appointing a Receiver without substantiation, would essentially terminate the operation of Young Star's facility without due process of law. "Defendant would undoubtedly incur substantial harm if [the Department's] allegations remained unsubstantiated following a full hearing on the issue." [Id. at 2.]   Thereafter, the trial court conducted an evidentiary hearing on March 9-10, 2021.

### *The Evidentiary Hearing*

{¶13}  Kristina Leohr testified that she had been employed as a Youth Care Specialist at Young Star from June through November 2020. She had no previous experience working in a residential facility. As part of her duties, Leohr was trained in how to restrain a resident.  Leohr had personally been involved in the application of a restraint against a resident on twelve separate occasions. Leohr described an incident she witnessed involving a youth approximately 6'5" who had become upset.  She testified that she witnessed four staff members dog pile the youth while he was on his bed. Id. She further testified to witnessing multiple occasions of the staff place the youth's hands behind his back and push inward to the point where the youths were screaming. Leohr further testified to instances where the staff would instigate the youths. Leohr testified that the use of proper restraint procedures can inflict pain that will cause a youth to scream.

{¶14}  When she brought her concerns to the supervisor, Leohr testified that she was told that some boys just needed harsher treatment. Leohr testified that she did not prepare any written reports expressing her concerns or otherwise bring to the attention of

anyone her concerns regarding the incidents she had witnessed. She further admitted that no one told her to change or redact any portion of the reports she filed.

{¶15} Leohr further testified that she was suspended in October 2020 after allegedly engaging in an inappropriate relationship with a youth at the facility and then quit her job before the conclusion of the investigation of her conduct.

{¶16} Susan Sekely a Behavioral Health Standard Surveyor Supervisor testified that several issues were raised in 2018. Specifically a staff member had used an improper prone restraint method on a youth. T. at 103 - 104. Sekely noted that the staff member involved in the action was fired by Young Star. T. at 147. In fact, Sekely testified that all the concerns raised in 2018 had been remedied to the Department's satisfaction at the time the State issued the initial licensure and certification to Young Star on September 11, 2018. T. at 131.

{¶17} James Budimlic is a Behavior Health Standard Surveyor for the Department. Budimlic testified that he had received physical restraint training at Parma Dale in 1990-1991. T. at 213. Budimlic received Managing Youth Resistance training while he work for the Department of Youth Services at Indian River from 2009 to 2011. Id. Budimlic was involved in four restraint incidents while at Indian River. T. at 168; 213. Budimlic has received no physical restraint training since leaving Indian River. T. at 213-214. Budimlic testified that the Department does not provide physical restraint training to its surveyors. T. at 214.

{¶18} Budimlic became involved in an investigation of Young Star in January 2021. T. at 173. He visited the facility as part of his investigative duties on January 28, 2021, February 2 and 3, 2021, February 26 and March 5, 2021. T. at 173-174. Apryl

Morris, Sarah Malik, Donna Sabo, Denise Cole, Maggie Cooper, and Tina Nutter who are also employed by the Department also took part in the investigations in various capacities at various times. T. at 175- 176. The investigation was initiated by several complaints that the Department received. T. at 176. All of the complaints came from the same individual. T. at 177.

{¶19} The surveyors gather documents, interviewed staff and residents and gathered video evidence of physical restraints being employed by the staff. Budimlic utilized the Young Star's restraint log to find instances of physical restraints being employed. T. at 189-190. He would then request video footage of the incidents. Specifically, Budimlic obtained and reviewed incidents involving a youth identified as ZR. T. at 190. He obtained further video footage of an incident involving NR on January 20, 2020 that lasted twenty-three minutes. T. at 196. Further video footage of incidents involving NS in December 2020 was obtained. [State's Exhibit 6 and 7]. T. at 198; 200. A January 2, 2020 incident involving NG was reviewed by Budimlic. [State's Exhibit 8]. T. at 200 -201. A February 9, 2020 incident involving JC was received and reviewed by Budimlic. T. at 201-202; State's Exhibit 9. However, the trial court did not permit Budimlic to testify about the contents of any of the videos. T. at 195. The Department did make a proffer of Budimlic's testimony concerning the video evidence. T. at 231-256. The videos were admitted into evidence by the trial court.

{¶20} During his March 5, 2021 visit to Young Star, Budimlic personally observed the restraint of a youth by employees of the Department. T. at 208. He observed the youth restrained by the staff face up on the floor in a supine position. A female staff member attempted to put a t-shirt over the youth's mouth to prevent him from spitting on

the staff; however, a supervisor informed her that she could not cover the youth's mouth. T. at 208.

{¶21} Sara Malik a Behavioral Health Standard Surveyor testified that when the Department receives a complaint against a facility it would come to her. T. at 264. She would then determine whether further onsite investigation was necessary or whether a determination could be made through the documentation alone. Id. If the complaint concerns a matter that is not regulated by the Department, Malik would refer the complaint to someone else. Id.

{¶22} When doing an onsite investigation, the facility is not notified in advance. T. at 268. The surveyors would arrive and inform the facility that a complaint has been received. Id. The surveyors would then begin collecting documentation. Id. As part of her duties, Malik was required to be familiar with restraint restrictions and Ohio Admin. Code Section 5122-26-16. T. at 270.

{¶23} In this case, a former employee called Malik directly expressing concerns about how the facility was being run, and gave Malik a rundown of her grievances. T. at 270-271. The complainant believed she had been terminated from Young Star in retaliation for reporting abuse to Children's Services. T. at 271. Malik began her investigation of Young Star on January 28, 2021. T. at 270.

{¶24} Malik and her team returned on February 2 and 3, 2021 to gather further information. T. at 272. Malik returned in part based upon concerns that had raised during her interviews with residents about the use of restraints. T. at 272-273. Malik interviewed twenty-two residents during her three days at the facility. T. at 274.

{¶25} Malik reviewed Young Star's restraint log and determined which incidents warranted further investigation. T. at 287. Based upon the information she had received, Malik reviewed video footage to determine if the information she had obtained was documented in the video footage of the incidents in question. T. at 289.

{¶26} The Department obtained video footage of the use of restraints by the staff involving NG, ZR, and NR. T. at 290-292. Malik was not permitted to testify as to whether any of the youths told her that they were afraid or fearful. T. at 293. However, the Department proffered Malik's testimony on this issue. T. at 451-467.

{¶27} Malik testified that the Department has not prepared a report based upon the investigation that was completed on February 3, 2021. T. at 296.

{¶28} Behavioral Health Surveyor Apryl Morris testified that the Ohio Administrative Code concern the use of restraints at residential facilities licensed by the Department. T. at 307.[1] Morris was required as part of her job duties to be familiar with the rules and to determine whether facility restraints and related documents are consistent with the rules. T. at 308. Morris was trained by the Department to review restraints used by a facility for compliance with the rules. Id.

{¶29} Morris testified that a restraint can be used whenever there is an imminent risk to the resident or anyone else. T. at 309. A restraint may not be used as a form of punishment. Id. Further, a restraint cannot obstruct an individual's breathing and if properly employed, should not cause injury to the person being restrained. T at 309-310. Morris described a "transitional hold" as one where a resident starting out in a prone position is quickly flipped over to his back. T. at 310-311. A transitional hold is to be

---

[1] Morris spelled her name for the record as "A-p-r-y-l M-o-r-r-i-s." T. at 301.

employed for the least amount of time. T. at 311. The purpose of such a hold it to allow the person to breath while at the same time allowing the staff to gain control of the situation. Id.  Prone restraints where the resident is lying face down are not allowed because that type of restraint can restrict the resident's breathing. T. at 311-312. The Ohio Administrative Code prohibits holding an individual in a face down position for an extended period of time. T. at 364. Morris testified that the regulations do not define what is to be considered an "extended period of time." T. at 364.

{¶30}  Morris testified that a supine restraint is one where the resident is lying on his back. T. at 312.  During that type of restraint, the staff is to talk to the resident to let them know what he needs to do to be released from the restraint. T. at 312-313.

{¶31}  Morris testified that the Ohio Administrative Code defines both inappropriate restraint and inappropriate use of a restraint. T. at 314.  An inappropriate restraint is using a restraint when there is no imminent risk of harm. T. at 314. The restraint should end when the resident is calm and no longer a physical threat. T. at 315.

{¶32}  Morris reviewed restraint documents generated by Young Star. T. at 328. On January 8, 2021 ZR received a small abrasion on the back of his shoulder while being restrained. T. at 328-330; State's Exhibit 11.   ZR further reported that pressure was applied to his left arm to the point of extreme pain.  T. at 331.

{¶33}  On January 20, 2021 NR received an injury to his left arm as a result of a restraint. T. at 338; 342; State's Exhibit 14; State's Exhibit 15. Further according to the restraint debriefing NR became angry with his peers and was walking away from the group when the restraint was applied without first attempting a less restrictive means to resolve the situation. T. at 339; State's Exhibit 14.

{¶34} On January 3, 2021 NG received a bruise to his right knee as a result of being restrained. T. at 350-351; State's Exhibit 20.

{¶35} Morris testified that previous concerns raised in March 2020 had been resolved with the plan of correction approved by the Department. T. at 390-391.

{¶36} At the conclusion of the Department's case, the Department's Exhibits 1 through and including 21, 33, and 35 through and including 37 were admitted as evidence without objection. T. at 447-448.

{¶37} Thereafter, Young Star moved the court to "summarily deny the State's Motion for the Appointment of a Receiver." T. at 468. After hearing the arguments of counsel, the trial court granted "the Motion for a Directed Verdict." T. at 494-495.

{¶38} This Court denied the Departments Motion for Injunction Pending Appeal by Judgment Entry filed March 26, 2021. This Court granted the Department's request and assigned this case to the Accelerated Calendar by Judgment Entry filed April 16, 2021.

*Assignments of Error*

{¶39} The Department raises three Assignments of Error:

{¶40} "I. THE TRIAL COURT SHOULD HAVE ADMITTED DEPARTMENT SURVEYOR SARAH MALIK'S TESTIMONY ABOUT THE FEARS EXPRESSED BY THE CHILDREN AT MOHICAN, WHICH FALLS UNDER THE EVID.R. 803(3) EXCEPTION TO THE HEARSAY RULE.

{¶41} "II. THE TRIAL COURT SHOULD HAVE ADMITTED DEPARTMENT SURVEYOR JAMES BUDIMLIC'S TESTIMONY ABOUT THE CONTENTS OF THE SURVEILLANCE VIDEO FOOTAGE HE OBTAINED DURING THE INVESTIGATION OF

MOHICAN, WHICH BUDIMLIC PERSONALLY REVIEWED AND WAS COMPETENT TO TESTIFY ABOUT.

{¶42} "III. THE TRIAL COURT EVALUATED YOUNG STAR'S MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER THE IMPROPER STANDARD, AND DID NOT PROPERLY EVALUATE THE EVIDENCE.

I.

{¶43} In the First Assignment of Error, the Department maintains that the trial court erred in preventing Malik from testifying to the residents' fears because the statements were admissible as a hearsay exception under Evid.R. 803(3), as a statement of "then existing state of mind, emotion, sensation, or physical condition."

**Standard of Appellate Review**

{¶44} "[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991). "However, we review de novo evidentiary rulings that implicate the Confrontation Clause. *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir. 2010)." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶97.

**Issue for Appellate Review:** *Whether the residents' statements made to Malik are admissible under Evid.R. 803(3), as a statement of "then existing state of mind, emotion, sensation, or physical condition."*

{¶45} Evid.R. 803(3) creates a hearsay-rule exception for "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a

statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

{¶46} "A victim's hearsay statements that she feared the defendant are admissible under Evid.R. 803(3) as declarations of the declarant's then-existing state of mind or emotion. *State v. Apanovitch*, 33 Ohio St.3d 19, 21, 514 N.E.2d 394 (1987). However, such hearsay testimony must still be relevant to the issues in the case. *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 110." *State v. Adams,* 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 219. The state-of-mind exception does not permit witnesses to relate any of the declarant's statements as to why he held a particular state of mind. *State v. Ahmed,* 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 74.

{¶47} The youths making the statements were identified by their initials during the proffer of Malik's testimony. T. at 452-454. In general terms Malik asked each of the residents that she had interviewed on January 28, 2021 and February 2, 2021 "if he had any fears or was afraid living at the facility." T. at 453. Several of the residents would have testified that they were afraid of being placed in restraints T. at 452-453.

{¶48} The statements to the effect that "I am afraid of being restrained" made to Malik at the time she spoke to the resident would be ""[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)" and thus could fall within the hearsay exception contained in Evid.R. 803(3). The statements do not refer to past events or a fear that existed in the past.

{¶49} However, without context, i.e. the reasons for the fear, the statements do not have any tendency to make it more probable or less probable that the conditions at Young Star present a substantial risk of physical or mental harm to the residents. Evid.R. R. 401. The statements do not differentiate between an appropriate restraint, appropriately used and an inappropriate restraint, or a restraint used inappropriately. The Department agrees that the residents of Young Star "already face mental and behavioral challenges." [Appellant's Brief at 12].

{¶50} It would not be unusual for any citizen to express a fear of being restrained by a person in authority such as a police officer, jailer or prison guard. An individual facing heighten mental and behavioral challenges might also face a heightened fear of being subdued even with acceptable, properly applied restraining tactics. The Department did not call the residents as witnesses to inquire about the reason for the fear.

{¶51} We note that any error will be deemed harmless if it did not affect the party's "substantial rights." Evid.R. R. 103(A). Before constitutional error can be considered harmless, we must be able to "declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Whether a party's substantial rights were affected depends on whether the error was prejudicial, i.e., whether it affected the outcome of the trial.

{¶52} Civ.R. 61 sets forth the harmless error rule in civil cases, providing that no error or defect in any ruling is "ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice." *See, State of Ohio, ex rel. Attorney General v. Vela,* 5th Dist. Licking No. 12–CA–62, 2013–Ohio–1049,

¶ 41. "Generally, in order to find that substantial justice has been done to an appellant so as to prevent reversal of a judgment for errors occurring at the trial, the reviewing court must not only weigh the prejudicial effect of those errors but also determine that, if those errors had not occurred, the jury or other trier of the facts would probably have made the same decision." *Hallworth v. Republic Steel Corp.,* 153 Ohio St. 349, 91 N.E.2d 690 (1950), paragraph three of the syllabus.

{¶53} Upon review, we find the exclusion of Malik's interviews with the residents did not affect the Department's substantial rights because it did not effect the outcome of the case. Simply stating that a resident was afraid of restraints does not make it more probable or less probable the conditions existing at the residential facility present a substantial risk of physical or mental harm to residents and no other remedies at law are adequate to protect the health, safety, and welfare of the residents. R.C. 5119.342(A).

{¶54} The Department's First Assignment of Error is overruled.

II.

{¶55} In the Second Assignment of Error, the Department argues that the trial judge abused his discretion by not allowing surveyor Budimlic to give lay opinion testimony concerning the contents of surveillance video footage he obtained of several restraint incidents at Young Star.

**Standard of Appellate Review**

{¶56} "Evid.R. 701 affords the trial court considerable discretion in controlling the opinion testimony of lay witnesses." *State v. Grajales*, 5th Dist. Delaware No. 17CAC030020, 2018-Ohio-1124, ¶ 60, *citing State v. Harper*, 5th Dist. Licking No. 07 CA 151, 2008-Ohio-6926, ¶ 37, *citing Urbana ex rel. Newlin v. Downing*, 43 Ohio St.3d 109,

113, 539 N.E.2d 140 (1989). We therefore review a trial court's determination of the admissibility of lay witness opinion testimony for an abuse of discretion.

{¶57} An abuse of discretion can be found where the reasons given by the court for its action are clearly untenable, legally incorrect, or amount to a denial of justice, or where the judgment reaches an end or purpose not justified by reason and the evidence. *Tennant v. Gallick,* 9th Dist. Summit No. 26827, 2014-Ohio-477, ¶35; In *re Guardianship of S .H.*, 9th Dist. Medina No. 13CA0066–M, 2013–Ohio–4380, ¶ 9; *State v. Firouzmandi,* 5th Dist. Licking No. 2006–CA–41, 2006–Ohio–5823, ¶54.

**Issue for Appellate Review:** *Whether the trial court's decision to not permit Budimlic to testify to the contents of surveillance videos is untenable, legally incorrect, amounts to a denial of justice, or reaches an end or purpose not justified by reason and the evidence.*

{¶58} "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Ohio Evid.R. 701. Lay opinion, inferences, impressions or conclusions are therefore admissible if they are those that a rational person would form on the basis of the observed facts and if they assist the jury in understanding the testimony or delineating a fact in issue. Importantly, a lay witness cannot testify only to a "fact in issue" but can also testify to "an ultimate issue." Evid.R. 704 states that the testimony of a witness "in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact."

{¶59} Moreover, "there is no general rule that interpretation of a mechanical reproduction must be made by an expert." *State* v. Kehoe, 133 Ohio App.3d 591, 605, 729 N.E.2d 431(12th Dist. 1999). The critical point is whether the opinion of the lay witness will truly be helpful to the jury; i.e., if the basic facts are clear and the jury is able to draw its own conclusions, the lay opinion is not admissible. *See State v. Kehoe*, 133 Ohio App.3d 591, 603, 729 N.E.2d 431 (12th Dist. 1999); *City of Ashtabula v. Smith*, 11th Dist. No. 2000–A0029, 2001 WL 530466, (May 18, 2001) at *5–6, *citing Klotter, Criminal Evidence* (7 Ed. 1999) 277, Section 11.3 (Concurring Opinion of Judge Donald R. Ford).

{¶60} It is apparent from the Department's proffer of Budimlic's testimony, the he would testify that certain actions depicted on the videos were not in compliance with provisions of the Ohio Administrative Code concerning the use of restraints.

{¶61} Budimlic testified that he had received physical restraint training at Parma Dale in 1990-1991. T. at 213. Budimlic received Managing Youth Resistance training while he work for the Department of Youth Services at Indian River from 2009 to 2011. Id. Budimlic was involved in four restraint incidents while at Indian River. T. at 168; 213. Budimlic has received no physical restraint training since leaving Indian River. T. at 213-214. Budimlic testified that the Department does not provide physical restraint training to its surveyors. T. at 214.

{¶62} Budimlic testified that he sometimes helps out with investigations of complaints involving licensed facilities. T. 169-170. Investigations are not his primary employment duties with the Department; rather "[c]urrently right now I license Class I, II, and III classroom facilities." T. at 169. Budimlic testified that he does not hold himself out as an expert on restraints, nor does he have any credentials in that area. T. at 218.

**{¶63}** The record contains no evidence about the number of times Budimlic has been involved in an investigation concerning the use of restraints. Nor does the record contain any evidence that Budimlic is charged with deciding for the Department what constitutes an improper use of restraints. T. at 418-419; 423-424.

**{¶64}** Thus, the record contains an insufficient basis to conclude that Budimlic's opinion testimony was based on his experience; rather, his opinion is based upon the wording of the Ohio Administrative Code. T. at 214; 417. Because Budimlic's proposed testimony merely provided his own interpretation or characterization of the actions of Young Star's staff as depicted on the video, we agree that such testimony was not proper opinion testimony. Budimlic did not observe the incidents, and the trial judge was able to view the surveillance videos himself to reach conclusions about what occurred. *See State v. Eddy*, 2017-Ohio-741, 86 N.E.3d 144, ¶ 54 (8th Dist.) (detective's testimony, based on reviewing a video, as to who shot first was not admissible where "detective did not witness the shooting, nor was his testimony helpful to the jury as the jurors were capable of viewing the video themselves to determine exactly what it did or did not know regarding who shot first"). *State v. Koch,* 2nd Dist. Montgomery No. 28041, 2019-Ohio-4182, ¶52; *State v. Andre,* 8th Dist. Cuyahoga No. 101023, 2015-Ohio-17, ¶ 25 ("Detective Berardi investigated the incident after the fact; he did not witness it. His opinion that Andre's actions were intentional was based on his after-the-fact investigation and review of the video. As such, Detective Berardi's testimony failed to satisfy the requirement that his opinion be 'rationally based on [his] perception.' Moreover, this is not a case in which the officer's opinion would have been 'helpful to a clear understanding of the witness'[s]

testimony or the determination of a fact in issue.' In this case, the trial court was capable

of viewing the video and drawing its own conclusion...")

{¶65}  The Department's Second Assignment of Error is overruled.

III.

{¶66}  In the Third Assignment of Error the Department contends that because the

case was tried to a judge the trial court erred in granting Young Star's motion for a directed

verdict; rather, the trial court should have consider the motion as a motion for involuntary

dismissal under Civ.R. 41(B)(2).

**Standard of Appellate Review**

{¶67}  Under Civ.R. 50(A)(4), a motion for directed verdict can only be granted

when, having construed the evidence most strongly in favor of the nonmoving party, the

court concludes that reasonable minds could only reach one conclusion upon the

evidence submitted and that conclusion is adverse to the nonmoving party. Conversely,

the motion must be denied when there is substantial competent evidence supporting the

position of the nonmoving party and reasonable minds might reach different conclusions.

*Hawkins v. Ivy,* 50 Ohio St.2d 114, 115, 363 N.E.2d 367 (1977). "The 'reasonable minds'

test mandated by Civ.R. 50(A)(4) requires the court to discern only whether there exists

any evidence of substantive probative value that favors the position of the nonmoving

party." *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.,* 95 Ohio St.3d 512, 2002-

Ohio-2842, 769 N.E.2d 835, ¶ 3. The nonmoving party "is entitled to have the trial court

construe the evidence in support of its claim as truthful, giving it its most favorable

interpretation, as well as having the benefit of all reasonable inferences drawn from that

evidence."   *Gibson v. Drainage Prods., Inc.,* 95 Ohio St.3d 171, 2002-Ohio-2008, 766

N.E.2d 982, ¶ 21, citing *Ruta v. Breckenridge-Remy Co.,* 69 Ohio St.2d 66, 68, 430 N.E.2d 935 (1982). *Accord Hargrove v. Tanner*, 66 Ohio App.3d 693, 695, 586 N.E.2d 141 (9th Dist. 1990). However, neither the weight of the evidence or the credibility of the witnesses are matters for the court's consideration under Civ.R. 50(A). *Wagner v. Roche Laboratories*, 77 Ohio St.3d 116, 119, 671 N.E.2d 252 (1996), *quoting Ruta* at 68-69, 430 N.E.2d 935.

{¶68} "A motion for directed verdict raises a question of law because it examines the materiality of the evidence, as opposed to the conclusions to be drawn from the evidence." *Ruta* at 69, 430 N.E.2d 935. Thus, we review a trial court's ruling on a motion for directed verdict de novo. *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.,* 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶ 4.

{¶69} In cases involving a bench trial, the rule governing directed verdicts is not applicable. *See, e.g., Williams v. Williams*, 5th Dist. Morrow No. 2010–CA–0006, 2011-Ohio-1200, 2011 WL 915750, ¶ 13 (additional citations omitted); *Cantor v. Wolfe,* 5th Dist. Fairfield No. 15 CA 64, 2016-Ohio-5300, 69 N.E.3d 1061, ¶19.

{¶70} In a bench trial, a defendant can move for Civ.R. 41(B)(2) dismissal after the plaintiff's case, which allows the trial court to determine the facts by weighing the evidence. On appeal, a dismissal on this ground will not be set aside unless there was a legal error or the judgment was against the manifest weight of the evidence. *Martin v. Lake Mohawk Property Owner's Assoc.*, 7th Dist. Carroll No. 04 CA 815, 2005-Ohio-7062, ¶ 19. "When reviewing a civil appeal from a bench trial, an appellate court utilizes a manifest-weight standard of review." *Victor v. Big Sky Energy, Inc.*, 11th Dist. Ashtabula No. 2017-A-0045, 2018-Ohio-4666, ¶ 50. *See also Susany v. Guerrieri*, 2016-Ohio-1062,

48 N.E.3d 637, ¶ 39-40 (7th Dist.). A trial court's ruling on a Civ.R. 41(B)(2) motion will be set aside on appeal only if it is erroneous as a matter of law or against the manifest weight of the evidence. *Mohn v. Ashland Cty. Chief Med. Examiner,* 2015-Ohio-1985, 34 N.E.3d 137, 145, ¶ 29, *citing Ogan v. Ogan*, 122 Ohio App.3d 580, 702 N.E.2d 472 (12th Dist. 1997); *Cantor v. Wolfe,* 5th Dist. Fairfield No. 15 CA 64, 2016-Ohio-5300, 69 N.E.3d 1061, ¶19.

{¶71} A reviewing court, in addressing a civil manifest weight challenge, must determine whether the finder of fact, in resolving conflicts in the evidence, clearly lost his or her way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *See Hunter v. Green, Coshocton* App. No. 12–CA–2, 2012-Ohio-5801, 2012 WL 6094172, ¶ 25; *Cantor v. Wolfe,* 5th Dist. Fairfield No. 15 CA 64, 2016-Ohio-5300, 69 N.E.3d 1061, ¶19. As part of the manifest-weight standard, the appellate court must presume that the trial court's findings of fact are correct. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 79–80, 10 OBR 408, 461 N.E.2d 1273(1984).

{¶72} "Application of the different standards [between Civ. R. 50 and Civ.R. 41(B)(2)] may render different results when a plaintiff succeeds in adducing evidence as to each element of her claim. In that situation, a trial court must deny a directed-verdict motion because the sufficiency of the evidence would require submittal of the case to the jury. However, the trial court could grant a Civ.R. 41(B)(2) involuntary dismissal if it, in its role as trier of fact, finds that the plaintiff's evidence fails to satisfy the required burden of proof." *Jarupan v. Hanna,* 173 Ohio App.3d 284, 2007-Ohio-5081, 878 N.E.2d 66 (10th Dist.), ¶12.

{¶73} Conversely, a plaintiff's failure to provide any evidence as to one or more elements of her claim would mandate the failure of the claim under either standard. *Jarupan* at 11.

**Issue for Appellate Review:** *Whether the Department adduced evidence as to each element of its claim for the appointment of a receiver pursuant to R.C. 5119.342.*

{¶74} R.C. 5119.342 provides, in relevant part,

(A) Upon petition by the director of mental health and addiction services, the court of common pleas or the probate court may appoint a receiver to take possession of and operate a residential facility licensed pursuant to section 5119.34 of the Revised Code, *when conditions existing at the residential facility present a substantial risk of physical or mental harm to residents and no other remedies at law are adequate to protect the health, safety, and welfare of the residents.*

Emphasis added. The authority to appoint a receiver is an "extraordinary, drastic and sometimes harsh power which equity possesses." *Hoiles v. Watkins*, 117 Ohio St. 165, 157 N.E. 557 (1927). Due to the extreme nature of the remedy, the movant must demonstrate the need for a receiver by clear and convincing evidence. *Malloy v. Malloy Color Lab, Inc.*, 63 Ohio App.3d 434, 579 N.E.2d 248 (10th Dist. 1989); *Victor Asset Acquisition, LLC v. Woogerd,* 5th Dist. Richland Nos. 15-CA-47, 15-CA-69, 2016-Ohio-1435, ¶26.

{¶75} Therefore, in the case at bar, the Department must prove by clear and convincing evidence that 1). Conditions existing at Young Star present a substantial risk

of physical or mental harm to residents; and, 2). No other remedies at law are adequate to protect the health, safety, and welfare of the residents.

{¶76} In the case at bar, the trial court found that the Department failed to prove by clear and convincing evidence both that conditions existing at Young Star present a substantial risk of physical or mental harm to resident, and that no other remedies at law are adequate to protect the health, safety, and welfare of the residents. T. at 492; *Judgment Entry*, filed March 11, 2021.

{¶77} Concerning past instances of non-compliance or violations, the evidence demonstrated that in one instance the offending employee was fired by Young Star and that all past incidents were resolved to the satisfaction of the Department.

{¶78} One video tape involved the employee who was subsequently fired. The trial court noted that five incidents involved one resident. The trial court further noted that some of the incidents occurred as a result of an adult staff member being assaulted or the resident having a history that if he acted in a certain way, it led to the assault of others. T. at 494.

{¶79} No testimony or evidence was presented to properly provide context to the video tape evidence. The circumstances that would have prompted the use of restraints in each instance was never explained. No evidence was presented to explain what was occurring and why staff was acting in a particular fashion.

{¶80} The standards set forth in the Ohio Administrative Code provide room for interpretation. It would seem that the generalities are expressed as a tacit recognition that these situations are fluid and no hard and fast set of procedures can be applied in every single case. In other word, what may be a technical violation or an improper restraint or

use of restraints in one situation may not be improper under the circumstances of a different situation. Without context explaining the reasons behind the decision to employ a restraint, what the staff and the resident were doing that may have prolonged the restraint or delayed the transitional hold or length of the transitional hold, the trier of fact is left to speculate. No evidence was presented concerning the appropriate standard for determining a proper or improper restraint under the particular circumstance of the incidents portrayed in the videotapes, other than the Department's subjective interpretation of the Ohio Administrative Code sections. For example, the Code provides no guidance for the trier of fact to determine what constitutes "an extended period of time" in relation to prone restraints.

{¶81} Further, the Department failed to present evidence concerning why having full-time monitors at Young Star was an inadequate remedy to ensure the safety of the residents. T. at 490.

{¶82} In sum, the Department failed to present evidence that 1). Conditions existing at Young Star present a substantial risk of physical or mental harm to residents; and, 2). No other remedies at law are adequate to protect the health, safety, and welfare of the residents.

{¶83} Therefore, the trial court's application of the directed verdict standard did not prejudice the Department, because judgment in Young Star's favor was appropriate under either the directed-verdict or the involuntary-dismissal standard.

{¶84} Accordingly, we conclude that the trial court did not err in its dismissal of the Departments case.

{¶85} The Department's Third Assignment of Error is overruled.

{¶86} The judgment of the Ashland County Court of Common Pleas is affirmed.

By Gwin, P.J.,

Hoffman, J., and

Wise, Earle, J., concur